**SO ORDERED: April 13, 2017.**



**James M. Carr**
**United States Bankruptcy Judge**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| IN RE: | ) |
| | ) |
| COURTNEY P. GALYAN, | ) Case No. 15-00134-JMC-7A |
| | ) |
| Debtor. | ) |
| ——————————————————— | ) |
| | ) |
| COMMUNITY FIRST BANK OF INDIANA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Adversary Proceeding No. 15-50333 |
| | ) |
| COURTNEY P. GALYAN, | ) |
| | ) |
| Defendant. | ) |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

THIS MATTER came before the Court for a bench trial on January 17, 2017.  Plaintiff,

Community First Bank of Indiana ("CFB" or "Bank"), appeared by counsel Anthony R. Jost and

Elizabeth C. Green.  Defendant, Courtney P. Galyan ("Galyan"), appeared by counsel

KC Cohen.  At the conclusion of the trial, the Court took the matter under advisement and

invited the parties to submit proposed findings of fact and conclusions of law by January 31, 2017.

The Court, having reviewed the evidence presented at the trial, the *Stipulation as to Background Facts and the Authenticity of Documents* filed by the parties on December 29, 2016 (Docket No. 16) (the "Stipulation"), the *Pre-Trial Brief* filed by Galyan on January 12, 2017 (Docket No. 19) ("Galyan's Brief"), the *Plaintiff, Community First Bank of Indiana's, Pre-Trial Brief* filed on January 12, 2017 (Docket No. 21) ("CFB's Brief"), the proposed findings of fact and conclusions of law timely submitted by the parties, and the other matters of record in this adversary proceeding; having weighed the credibility of the witnesses; having heard the presentations of counsel at the trial; and being otherwise duly advised, now enters the following findings of fact and conclusions of law as required by Fed. R. Civ. P. 52, made applicable to this adversary proceeding by Fed. R. Bankr. P. 7052.

## Findings of Fact

As contained in the Stipulation, CFB and Galyan have jointly stipulated to the following facts:[1]

1.    Galyan earned his undergraduate degree in finance.

2.    Pursuant to an Assignment of Membership Interest in Limited Liability Company effective on or about December 31, 2007 [("Assignment of Membership Interest")], the Amended and Restated Patrick W. Galyan Trust u/a December 18, 2001, as Amended ("Trust")—as a Class A Member and Class B Member of Galyan Enterprises, LLC ("Galyan Enterprises")—assigned to Galyan .8% of all of the Membership Rights in [Galyan Enterprises]

---

[1]    Except where noted by brackets, these stipulated facts (findings 1 through 23) are included verbatim, with no adjustment to account for typographical errors or terms defined elsewhere herein.

(such .8% being 80 Class B Units), and the Trust retained 99.2% of all of the Membership Rights in Galyan Enterprises.

3. One of the assets owned by Galyan Enterprises was commercial real estate located at 2382 E. Main St. in Plainfield, Indiana (the "Real Estate").

4. At no time did Galyan's ownership interest in Galyan Enterprises exceed 80 non-voting, Class B Units.

*5.* At no time did Galyan own the Real Estate in his individual capacity.

6. On or about September 15, 2010, Galyan organized CG Bear Enterprises, Inc. ("CG Bear Enterprises").

7. On or about December 24, 2010, CG Bear Enterprises entered into an Area Development Agreement ("ADA" with Marco's Franchising, LLC ("Marco's Franchising") whereby Marco's Franchising granted CG Bear [Enterprises] the right and license to open nine additional Marco's Pizza Stores.[2]

8. Galyan personally guaranteed CG Bear Enterprises obligations under the ADA.

9. The ADA was subsequently terminated and CG Bear Enterprises, in part, became obligated for developing approximately 37 Marco's Pizza Stores in the Indianapolis area as the master developer/sub-franchisor.

10. Galyan was also a partner in two other limited liability companies with Brandon Gorin relating to the Marco's Pizza sub-franchise agreement and operating of a Marco's Pizza Store located at 71st Street and Binford Boulevard in Indianapolis, Indiana.

11. On or about April 18, 2011, Galyan completed a U.S. Small Business Administration Personal Financial Statement.   On his Personal Financial Statement, Galyan

---

[2] At the trial, Galyan clarified that it was a multi-unit franchise agreement, as compared to the ADA, which CG Bear Enterprises entered into in December 2010.

represented that:  he was 80% owner of Galyan Enterprises; that the Real Estate was valued at approximately $2,500,000 and subject to a debt instrument of approximately $1,250,000.00; that Galyan Enterprises' net equity was approximately $1,250,000.00.

12.     On or about May 18, 2011, Galyan executed an Installment Promissory Note in the amount of $142,500.00 in favor of Patrick W. Galyan [("May 2011 Promissory Note")].

13.     In or about early 2012, Courtney Galyan sought financing from Indiana Business Bank for CG Bear Harbor, LLC and CG Bear Georgetown, LLC for the purpose of opening two Marco's Pizza Stores located in Noblesville, Indiana and on Georgetown Road in Indianapolis, Indiana, respectively.

14.     As part of that loan approval process, on or about April 26, 2012, Galyan completed and executed an Indiana Business Bank Personal Financial Statement ("IBB PFS"). On the IBB PFS, Galyan represented that he was the 100% owner of the Real Estate, which Galyan represented was valued at $800,000.00.

15.     Galyan secured that financing, and personally guaranteed the loan(s) made by Indiana Business Bank.

16.     CFB was subsequently approached regarding the possibility of financing another Marco's Pizza store operated by a Galyan entity.

17.     With Galyan's consent, Indiana Business Bank provided CFB with the April 26, 2012 IBB PFS, among other documentation regarding Indiana Business Bank's loan(s) to Galyan entities.

18.     On or about August 24, 2012, CFB approved a $275,000 loan to be made to, as co-borrowers, CG Bear Enterprises and a limited liability company to be formed by Galyan.

19.     On or about September 19, 2012, Galyan completed and executed a U.S. Small Business Administration Personal Financial Statement ("SBA PFS" and a CFB Personal Financial Statement ("CFB PFS").  On the SBA PFS and the CFB PFS, Galyan represented that he was 100% owner of the Real Estate valued at $150,000.00.

20.     On or about September 20, 2012, Galyan organized CG Bear 10th St, LLC ("CG Bear 10th St") for the purpose of opening a Marco's Pizza location at 10th Street and Girls School Road in Indianapolis, Indiana.

21.     On or about or effective December 13, 2012, CG Bear Enterprises and CG Bear 10th St executed a U.S. Small Business Administration Note, pursuant to the terms of which CFB agreed to loan funds to CG Bear Enterprises and CG Bear 10th St, as jointly and severally liable co-borrowers, in the original principal amount of Two Hundred Seventy-five Thousand Dollars ($275,000.00) ("December 13, 2012 SBA Note").

22.     Also on December 13, 2012, Galyan executed an SBA Unconditional Guarantee, guaranteeing full and prompt payment of the December 13, 2012 SBA Note ("Unconditional Guarantee").

23.     CG Bear Enterprises and CG Bear 10th St subsequently defaulted on the December 13, 2012 SBA Note, and Galyan subsequently defaulted on the December 13, 2012 Unconditional Guarantee.

The Court makes the following additional findings of fact:

*Galyan's Work Experience*

24.     Between 2004 and 2005, Galyan worked for real estate development company Premier Properties.

25.     From 2005 through 2010, Galyan continued work in real estate development for Gershman Brown and Crowley.

26.     It was during the time Galyan was working for Gershman Brown and Crowley that he obtained a partial ownership interest in Galyan Enterprises.

*Patrick Galyan and Galyan Enterprises*

27.     Patrick Galyan, who is the father of Galyan, previously owned Galyan's Trading Company which operated sporting goods stores.

28.     Patrick Galyan established Galyan Enterprises on or about June 6, 1998 and subsequently assigned his membership interest of 100 Class A Units and 9,900 Class B Units in Galyan Enterprises to his Trust.  (Plaintiff's Exs. 1 and 2.)

29.     Galyan acknowledges that the December 31, 2007 Assignment of Membership Interest he signed confirms that Galyan was not the 100% owner of Galyan Enterprises or 100% owner of the Real Estate.  (Plaintiff's Ex. 3.)

30.     Because the partial membership interest in Galyan Enterprises assigned to Galyan in 2007 was limited to Class B Units only, Galyan lacked ability to make any decisions as to the direction or financial changes in Galyan Enterprises.

31.     The February 20, 2008 *Deal Structure*, which had been prepared by Patrick Galyan and seen by Galyan, outlined a loan transaction by which a portion of Patrick Galyan's Trust's membership interest would be redeemed.  (Plaintiff's Ex. 4.)  Nowhere in the *Deal Structure* does it state that Galyan was to be the 100% owner of Galyan Enterprises or of the Real Estate.  Instead, pursuant to the *Deal Structure*, Galyan would be a 75% owner of Galyan Enterprises and the Trust would retain a 25% membership interest in Galyan Enterprises

32.    Pursuant to a March 25, 2008 letter directed to Patrick Galyan and Galyan, Harris, N.A. outlined its commitment for a $1,250,000 loan to be made to Galyan Enterprises. (Plaintiff's Ex. 5.)

33.    Galyan signed a *Membership Interest Redemption Agreement* dated March 26, 2008 ("Redemption Agreement") as both "Remaining Member" and also on behalf of Galyan Enterprises along with Patrick Galyan on behalf of his Trust as a Class A member and Class B member of Galyan Enterprises.  (Plaintiff's Ex. 6.)

34.    Pursuant to the Redemption Agreement signed by Galyan, Patrick Galyan's Trust was to retain 1.66 Class A Units and 25 Class B Units.  Pursuant to the Redemption Agreement signed by Galyan, the Trust would retain 25% of equity of Galyan Enterprises and 100% of the voting Class A Units.

35.    Galyan acknowledges that the Redemption Agreement he signed confirms that Galyan was not the 100% owner of Galyan Enterprises or 100% owner of the Real Estate.

36.    Galyan also executed the *Written Consent to Resolutions by the Members of Galyan Enterprises, LLC* dated March 26, 2008 ("Written Consent").  (Plaintiff's Ex. 7.)  The terms of the Written Consent made clear that Patrick Galyan's Trust remained a member of Galyan Enterprises when the loan was being made by Harris, N.A. as the Written Consent was signed, in part, on behalf of the Trust as both a Class A and Class B Member.

37.    The Written Consent gave authority to Patrick Galyan's Trust and to attorney Michael McNelis to execute loan documents on behalf of Galyan Enterprises.  The Written Consent did not give authority to Galyan to execute loan documents on behalf of Galyan Enterprises.

38.    Galyan acknowledges that the Written Consent he signed confirms that Galyan was not 100% owner of Galyan Enterprises or 100% owner of the Real Estate.

39.    On March 27, 2008, Galyan executed a *Limited Power of Attorney* authorizing attorney Michael McNelis to act as Galyan's attorney-in-fact and to execute documents regarding the closing of the loan between Harris, N.A. and Galyan Enterprises.  (Plaintiff's Ex. 7.)

40.    The loan closed in early April 2008, in which Galyan Enterprises borrowed $1,250,000 from Harris, N.A. and mortgaged the Real Estate to Harris, N.A.

41.    The *Real Estate Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing*, recorded with the Hendricks County Recorder on April 16, 2008 as Instrument No. 200809256 ("Mortgage"), states that Harris N.A. was the secured party and that Galyan Enterprises was the debtor.  (Plaintiff's Ex. 7.)  The Mortgage also states that Galyan Enterprises was the owner of the Real Estate.

42.    While Galyan testified that he believed the 2008 loan from Harris, N.A. was made in order for Galyan to purchase the Real Estate in its entirety from Patrick Galyan, the terms of the March 25, 2008 letter of commitment from Harris, N.A. signed by Galyan and the April 2008 loan transaction as it actually occurred do not support Galyan's claimed belief.

43.    An August 11, 2008 electronic correspondence from Patrick Galyan to Galyan and Patrick Galyan's then CPA, Duane Wingert ("Wingert"), references "the sale of the land" to Galyan.  (Defendant's Ex. B.)  However, that correspondence does not identify the referenced real estate or transaction.  The correspondence also does not state that Galyan's ownership interest in the unidentified real estate was 100%, and the parties have stipulated that Galyan was never 100% owner of the Real Estate.

44.     An October 12, 2008 electronic correspondence from Wingert references reimbursement of funds to Galyan Enterprises "since [Galyan] became owner of Galyan Enterprises." (Defendant's Ex. A.)  Wingert's correspondence does not state that Galyan was 100% owner of Galyan Enterprises and is consistent with the parties' understanding that, as of October 2008, Galyan was a partial owner of Galyan Enterprises.  In addition, Wingert's correspondence makes clear that Galyan Enterprises, and not Galyan individually, owned the referenced real estate

45.     No documents exist, from the loan closing or otherwise, stating that at any time Galyan was the 100% owner of the Real Estate.

46.     Galyan acknowledged during his trial testimony that he took no steps to actually verify the scope, if any, of his ownership interest in the Real Estate or in Galyan Enterprises.

47.     In or about November 2011, Galyan Enterprises sold a portion of the Real Estate to Aldi for approximately $800,000 to $850,000.  Those proceeds were paid to Harris, N.A. toward the $1,250,000 debt owed by Galyan Enterprises.

48.     Shortly after the sale to Aldi, Patrick Galyan paid off the remaining debt of approximately $400,000 owed to Harris, N.A.  This payment by Patrick Galyan of Galyan Enterprises' outstanding loan obligation is inconsistent with Galyan's now claimed belief that he was the 100% owner of Galyan Enterprises.

49.     The K-1 received by Galyan in early 2012 with regard to his ownership interest in Galyan Enterprises in 2011 states that Galyan's share of profit, loss and capital in Galyan Enterprises at the end of year 2011 was 0%.  (Plaintiff's Ex. 17.)

50.    The K-1 received by Galyan with regard to his ownership interest in Galyan Enterprises in 2012 states that Galyan's share of profit, loss and capital in Galyan Enterprises for the entire year of 2012 was 0%.  (Plaintiff's Ex. 18.)

### Galyan's Involvement with Marco's Pizza

51.    After moving back to Indianapolis in 2010, Galyan became involved with Marco's Franchising.  In addition to securing financing from Indiana Business Bank for CG Bear Harbor, LLC ("CG Bear Harbor") and CG Bear Georgetown, LLC, Galyan also secured financing from Indiana Business Bank for the acquisition of MP1151, LLC—a Marco's Pizza Store owned by a former Marco's Franchising area developer.

52.    Galyan established CG Bear Harbor on or about April 7, 2011.  Galyan knew that the Noblesville Marco's Pizza Store operated by CG Bear Harbor was going to be a bad store, and that store struggled from its first day.  In fact, the situation with the Noblesville Marco's Pizza Store was so bad that in June 2013—approximately six months after CFB had made its loan to Galyan's entities—Galyan approached Indiana Business Bank suggesting the store be closed.

53.    In or about May 2011, Patrick Galyan made a loan to Galyan as Galyan continued with Marco's Pizza.  Pursuant to the payment terms of the May 2011 *Installment Promissory Note* executed by Galyan on or about May 18, 2011, the $142,500 debt Galyan owed to Patrick Galyan was to be paid back in full by 2018.  (Plaintiff's Ex. 9.)

54.    Since May 18, 2011, Galyan has made partial payment, but approximately $110,000 to $120,000 of the undisputed debt obligation owing since May 18, 2011 remains unpaid.[3]

---

[3]    Galyan acknowledges that he did not list Patrick Galyan as a creditor in his bankruptcy proceedings despite this indebtedness.

55.    Galyan executed and verified the April 26, 2012 IBB PFS which stated, in part:

The information contained in this statement is provided to induce you to extend or to continue the extension of credit to the undersigned or to others upon the guaranty of the undersigned.  The undersigned acknowledges and understands that you are relying on the information provided herein in deciding whether to grant or continue credit or to accept a guaranty thereof.  Each of the undersigned represents, warrants, and certifies that (1) the information provided here is true, correct and complete and gives a correct and complete showing of the financial condition of the undersigned, (2) the undersigned has no liabilities direct, indirect or contingent except as set forth in this statement, and (3) legal and equitable title to all assets herein is in the undersigned's sole name, except as may be herein or otherwise noted.  Each of the undersigned agrees to notify you immediately and in writing of any change in name, address, or employment and of any material adverse change (1) in any of the information contained in this statement or (2) in the financial condition of any of the undersigned or (3) in the ability of any of the undersigned to perform its (or their) obligations to you.

(Plaintiff's Ex. 11.)

56.    On the April 26, 2012 IBB PFS, Galyan stated that he was the 100% owner of the Real Estate in his personal capacity, and made no reference to Galyan Enterprises as owner of the Real Estate.[4]

57.    Galyan did not disclose on the April 26, 2012 IBB PFS the liability owed by Galyan to his father Patrick Galyan pursuant to the May 2011 Installment Promissory Note. According to Galyan's testimony, Galyan did not disclose this liability based in part upon Patrick Galyan's advice to Galyan to leave the debt "off the books" in light of SBA regulations and so that Patrick Galyan would not be required to personally guarantee the loans made to Galyan's various business entities.

---

[4]    Galyan's testimony during the trial of this matter varied regarding whether Galyan had believed he individually owned 100% the Real Estate or whether he believed he was the 100% owner of Galyan Enterprises, which in turn was the owner of the Real Estate.  In any event, the parties have stipulated that neither was true.

**CFB Loan**

58.    CFB is a full-service commercial bank providing consumer and commercial loans, and its main office is located in Kokomo, Indiana.  CFB lends in the Indianapolis market.

59.    CFB representative Kelly Ayers ("Ayers") has been in the banking industry for 37 years and has extensive education and training, has worked as a commercial lending officer for 22 years, and has been employed by CFB since 2008.  As of 2012 when the loan to Galyan's business entities was reviewed, approved, and made by CFB, Ayers served as Vice President of Commercial Banking for CFB and specialized in SBA and other credit enhancement programs. Ayers has known representatives of Indiana Business Bank for approximately eight years.

60.    Robert Blume ("Blume") has acted as President and Chief Executive Officer of CFB since 2013.  Blume has been employed by CFB since 2003 when he was one of the original founders of CFB.  At the time the loan to Galyan's business entities was reviewed, approved, and made by CFB, Blume served as Executive Vice President and Chief Credit Officer for CFB and had served in that capacity for approximately nine years since starting CFB.  In that capacity, Blume oversaw the entire credit process, wrote the credit policy, assured implementation of the credit policy, reviewed loan requests, sat on CFB's loan committee, and ensured proper procedures were in place regarding CFB's extension of credit.  Blume's review of any loan request as Chief Credit Officer would include review of personal financial statements authored by borrowers or guarantors. Blume has extensive education, training, and experience in reviewing loan packages.  Blume has been involved in the banking industry since 1986 and has known representatives of Indiana Business Bank for many years.

61.    In addition to being familiar and having had experience with personnel of Indiana Business Bank, CFB knew Indiana Business Bank's lending philosophies.   There was a

longstanding relationship between the banks involving loan participation and referrals since the charter of Indiana Business Bank in 2004.  Prior to the loan made to Galyan's entities in 2012, CFB had worked with Indiana Business Bank either as a participating bank or by way of referral between 25 and 50 times.

62.    In determining whether or not to approve a loan, CFB utilizes the five C's of credit:  character, cash flow, collateral, capital, and conditions.  Separately, CFB is required by the FDIC and regulatory agencies to maintain a credit rating system with regard to the risk of individual loans as well as to stratify CFB's loan portfolio in terms of risk ratings.  This system is required to be borrower-based and does not take guarantors into account because the system is to rate the risk of loan default as compared to risk of loss to CFB.

63.    CFB's *C&I Commercial Loan Risk Rating Criteria* ("Risk Rating Criteria") pulls information together from the credit underwriting process for any potential loan and is used to derive the loan grade and is used, in part, by third party bank examiners.  (Plaintiff's Ex. 15.) The Risk Rating Criteria is not a tool used by CFB to determine whether to approve or deny a loan and does not contemplate every basis for CFB's lending decision, including the strength of any financial statement.

64.    CFB was familiar with the respected "Galyan" surname and first came to know Galyan during a meeting hosted by Indiana Business Bank in early 2012 for the purpose of determining if CFB would be interested in making a loan to Galyan's business entities in order to own and operate another Marco's Pizza Store.  CFB understood that Indiana Business Bank had already financed Galyan's business entities with regard to two Marco's Pizza Stores.

65. CFB understood that Patrick Galyan would gift the 10% equity stake required by the SBA into the 10th Street Marco's Pizza Store and would also act as a mentor to Galyan and serve on the board of directors for Galyan's Marco's continued business ventures.

66. Galyan was an experienced businessman, having had previous and ongoing business dealings with his father Patrick Galyan, Marco's Franchising, his business partner Brandon Gorin, and Indiana Business Bank, among others. Before entering into discussions with CFB, Galyan had been vetted by Marco's Franchising both as a franchisee as well as a territory developer. Galyan had also been vetted at least twice by Indiana Business Bank and the SBA, which provided CFB with a certain comfort level because CFB knew Galyan had already undergone formal underwriting and had been approved. In light of this, as well as the strong reputation of the "Galyan" surname, CFB had no reason to disbelieve the information contained in Galyan's personal financial statements.

67. The SBA required that Galyan act as guarantor of the loan because of his ownership interest in CG Bear Enterprises and CG Bear 10th St. In addition to pursuing an SBA guarantee, CFB also required that Galyan act as guarantor based in part on his financial worth and the assets purportedly available to him, including the Real Estate, as a potential source of repayment or financial support as needed for the 10th Street Marco's Pizza Store operations and any loan made by CFB. Pursuant to its *Loan Policy*, CFB requires a personal financial statement because it gives CFB permission to pull a credit report on the borrower or guarantor and allows CFB to be able to evaluate the person providing the statement as a potential source of repayment or financial support. (Plaintiff's Ex. 10.) The April 26, 2012 IBB PFS was the first personal financial statement CFB had in its possession, which had been provided to CFB by Indiana Business Bank with Galyan's authorization.

68.     Galyan's purported 100% ownership in the Real Estate with no mortgage as listed on the April 26, 2012 IBB PFS was something CFB considered when determining whether to make a loan to CG Bear Enterprises and CG Bear 10th St.  This was because the Real Estate was purportedly owned by the guarantor, Galyan, and could be used as a financial resource to be borrowed against, or to be pledged as collateral, at a later time if needed.

69.     Had Ayers known at the time he was reviewing the loan application for approval by CFB that the Real Estate was not owned 100% by Galyan or by a company of which Galyan was the 100% owner, Ayers would not have recommended the loan for approval because there would not have been any substance behind the personal financial statement and no avenue for Galyan as guarantor to help provide financial support to the borrowers as needed.

70.     In order for Galyan's loan request to be considered, CFB also requested Galyan submit to CFB three years of tax returns, existing and updated financial statements for Galyan's business entities, Marco's corporate documents, two years of financial projections for the new Marco's Pizza Store located at 10th Street, a personal financial statement, and cost estimates for leasehold improvements and equipment.  Because Galyan Enterprises was not a borrower, CFB had no reason to review any K-1 from Galyan Enterprises during its loan evaluation process.

71.     CFB also performed a credit score check on Galyan as part of the loan approval process.  Galyan's credit report revealed there were no outstanding liens or delinquent payments that would have impacted his credit score.  Ayers testified that the May 2011 Installment Promissory Note was not reported to the credit agency and therefore was not identified as outstanding debt owed by Galyan when CFB performed its credit score check.

72.     On or about September 10, 2012, Ayers and Blume met and discussed the proposed loan, and CFB approved making the loan to Galyan's entities based on its analysis of

the five C's of credit. (Plaintiff's Ex. 14.) In approving the loan, Blume saw reference to Galyan's ownership of the unencumbered Real Estate on the April 26, 2012 IBB PFS, which was the most striking thing because of the substance and depth it added to Galyan's personal financial statement. Blume commented on the availability of the Real Estate to Ayers and knew this asset would provide Galyan with the ability to provide financial support in the event of future financial difficulty. The existence and availability of the Real Estate weighed into Blume's decision to approve the loan.

73. The loan was approved by Blume in accordance with CFB's Loan Policy in effect at that time subject to an SBA guarantee in accordance with SBA guidelines. The loan was to be secured by a security interest on business assets, Galyan's Unconditional Guarantee, and a 75% guarantee by the SBA.

74. Had Galyan not listed on the April 26, 2012 IBB PFS his 100% ownership interest the Real Estate, the loan would not have been approved by Blume under the same terms and conditions because there would have been no guarantor support from Galyan.

75. Had the loan from Patrick Galyan to Galyan properly been listed on the April 26, 2012 IBB PFS, the loan would not have been approved by Blume because it would have likely led to violation of SBA standard operating procedures and there would not have been any guarantor support from the SBA.

76. Had Galyan's 100% ownership interest in the Real Estate not been listed and the loan from Patrick Galyan to Galyan been properly listed on the April 26, 2012 IBB PFS, the loan would not have been approved by Blume.

77. Galyan subsequently submitted to CFB the September 19, 2012 SBA PFS, which Galyan signed and certified:

under penalty of criminal prosecution that all information on this form and any additional supporting information submitted with this form is true and complete to the best of [Galyan's] knowledge.

Galyan also acknowledged his understanding that:

the SBA or its participating Lenders, or Certified Development Companies will rely on this information when making decisions regarding an application for a loan from SBA or an SBA Participating Lender, or for participation in the SBA 8(a) Business Development (BD) program.

(Plaintiff's Ex. 12.)

78.     CFB required that Galyan complete CFB's personal financial statement as well. Galyan submitted the September 19, 2012 CFB PFS which contained the same verification language as contained in the April 26, 2012 IBB PFS.  (Plaintiff's Ex. 13.)

79.     On the CFB PFS, Galyan represented that he was 100% owner of the Real Estate valued at $150,000 (as also represented by Galyan on the SBA PFS), and Galyan represented he was 100% owner of Galyan Enterprises.  This reduction in value of the Real Estate did not impact CFB's loan approval because CFB was not taking a mortgage against the Real Estate and because Galyan was still able to provide financial support as guarantor.

80.     It did not matter to CFB whether the Real Estate was owned by Galyan individually or whether the Real Estate was owned by Galyan Enterprises, so long as Galyan was the 100% owner of Galyan Enterprises and maintained total control of the company and could take action with respect to the Real Estate as needed.

81.     The SBA did not require that CFB take the Real Estate as collateral, and Indiana Business Bank had made two prior loans without taking a mortgage on the Real Estate.  CFB also considered competitive pressures, including associated cost, in making a business decision not to take a mortgage on the Real Estate as part of the December 2012 loan transaction.  So as not to incur additional and unnecessary cost, CFB made a decision not to conduct a title search

on the Real Estate. Moreover, Galyan had verified the accuracy of the information in his multiple personal financial statements.

82.     On the SBA PFS and CFB PFS dated September 19, 2012 that Galyan submitted to CFB as guarantor, Galyan did not disclose his indebtedness to Patrick Galyan pursuant to the May 2011 Installment Promissory Note.

83.     At the time Galyan completed and verified the SBA PFS and CFB PFS dated September 19, 2012, Galyan knew of the undisclosed debt he owed to his father. Galyan also knew that CFB would likely want to know all of Galyan's liabilities, in addition to his assets, in order to analyze Galyan's creditworthiness.

84.     Patrick Galyan gifted $30,000 to Galyan on December 5, 2012 as debt-free equity in order to comply with the SBA's requirement for such equity and secure financing from CFB through the SBA-guaranteed loan.

85.     The December 5, 2012 letter signed by Patrick Galyan and Galyan stated, in part, that "[s]uch equity contribution shall be considered as a gift payment and shall require no repayments or interest on the full Thirty Thousand Dollars." (Plaintiff's Ex. 24.)

86.     CFB relied upon and believed this understood gifting by Patrick Galyan for capital to Galyan's entities in order to proceed with the SBA-guaranteed loan closing at a time when Galyan's obligation to Patrick Galyan under the May 2011 Installment Promissory Note remained outstanding.

87.     At no time did Galyan inform CFB about the debt obligation owed to his father pursuant to the May 2011 Installment Promissory Note or Galyan's deliberate intention and conscious decision to omit reference to that liability on the April 26, 2012 IBB PFS, the September 19, 2012 SBA PFS, and the September 19, 2012 CFB PFS.

88. At no time during its lending process did CFB ever know about the May 2011 Installment Promissory Note executed by Galyan in favor of his father. Had CFB known that Patrick Galyan held an outstanding loan obligation from Galyan, CFB's analysis and consideration would have changed regarding whether or not the $30,000 was an effective gift.

89. Had Galyan listed the debt obligation he owed his father on any of the three personal financial statements submitted to CFB, Ayers would not have recommended the loan for approval because there was limited income at that time and repayment capacity could not have been shown.

90. In addition, because the debt was owed to Patrick Galyan who subsequently had represented he was gifting $30,000 to Galyan, the debt would have likely disqualified the loan for SBA consideration. CFB representatives testified they did not believe the SBA would have approved the loan had the SBA known about the outstanding debt obligation owed by Galyan to Patrick Galyan and that the $30,000 was encumbered by another loan.

91. Blume also testified that had CFB known prior to closing the loan that Galyan had not listed the debt obligation owed to Patrick Galyan on his personal financial statements, it would have been a "deal killer" because CFB would have known it had been provided with false financial statements.

92. At no time prior to closing the CFB loan in December 2012 did Galyan inform CFB about CG Bear Harbor's financial struggles, even though Galyan proposed closing the store just six months later in June 2013.

93. On or about or effective December 13, 2012, in addition to executing the December 13, 2012 SBA Note that was guaranteed by Galyan, CG Bear Enterprises and CG Bear 10th St also executed SBA Security Agreements. (Plaintiff's Ex. 16.)

*Legal Proceedings*

94.    CG Bear Enterprises and CG Bear 10th St stopped making payments on their loan to CFB in approximately October 2013.

95.    Pursuant to an *Assignment of Membership Interest in Galyan Enterprises, LLC* ("Assignment") dated December 16, 2013, Galyan transferred and assigned what ownership interest he still had in Galyan Enterprises to his father's Trust.  (Plaintiff's Ex. 20.)  Galyan received no consideration for the assignment and did not inform CFB that he was going to assign his ownership interest in Galyan Enterprises before Galyan did so.  Galyan understood that his father requested Galyan sign the Assignment in case Galyan filed for bankruptcy.

96.    With no forewarning to CFB, in May or June 2014, Galyan ceased running the Marco's Pizza Store on 10th Street and closed it.

97.    In June 2014, CFB filed suit against CG Bear Enterprises, CG Bear 10th St, and Galyan, among others, in the Marion County Superior Court, Cause No. 49D12-1406-CC-019485, seeking, in part, to mitigate its losses by taking the collateral in which CFB had a security interest and seeking judgment against the defendants in the principal amount of $281,700.53, plus interest at the applicable rate from June 9, 2014 until paid, plus costs of collection and reasonable attorneys' fees incurred.

98.    On January 11, 2015, Galyan filed a *Voluntary Petition* under chapter 7 of the United States Bankruptcy Code, 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code"),[5] in the United States Bankruptcy Court for the Southern District of Indiana, Indianapolis Division.

99.    On December 14, 2015, CFB filed its *Complaint Objecting to Dischargeability of Debt and Discharge of Debtor* (Docket No. 1) initiating this adversary proceeding and seeking

---

[5]    All statutory references herein are to the Bankruptcy Code unless otherwise noted.

nondischargeability of Galyan's debt owed to CFB pursuant to § 523(a)(2)(B).[6] Galyan filed his *Answer* on January 13, 2016 (Docket No. 6).

100.    As of the January 17, 2017 trial, CFB asserted that (a) the amount of the loan debt was $351,016.61, consisting of $174,503.95 in principal, $38,445.48 in accrued interest, $5,839.65 in fees, and $132,227.53 in expenses, including attorneys' fees (Plaintiff's Exs. 21 – 23); (b) interest continues to accrue at a *per diem* rate of $28.69; and (c) pursuant to the terms of the Unconditional Guarantee, CFB is entitled to judgment against Galyan in the amount of the loan debt, inclusive of attorneys' fees and costs of collection.

## Conclusions of Law

1.    Any finding of fact above will also be a conclusion of law, and any conclusion of law will also be a finding of fact to support the judgment of the Court.

*Jurisdiction and Venue*

2.    This court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 157 and 1334.

3.    This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

4.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

*Exception to Discharge: § 523(a)(2)(B)*

5.    Exceptions to discharges under § 523 "are to be construed strictly against a creditor and liberally in favor of the debtor." *In re Zarzynski*, 771 F.2d 304, 306 (7th Cir. 1985). "The burden is on the objecting creditor to prove exceptions to discharge." *Goldberg Securities, Inc. v. Scarlata (In re Scarlata)*, 979 F.2d 521, 524 (7th Cir. 1992) (citation omitted). The burden of proof required is a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279,

---

[6]    In pre-trial briefing and at the trial, CFB acknowledged that it is no longer pursuing counts II, III, or IV of its complaint with regard to denial of discharge. See CFB's Brief, p. 3, n.1.

291 (1991); *see also Peoples Trust and Sav. Bank v. Hanselman (In re Hanselman)*, 454 B.R. 460, 463-64 (Bankr. S.D. Ind. 2011).

6.      While the "Bankruptcy Code is designed in part to give insolvent debtors a fresh start," "only the 'honest but unfortunate debtor' can start anew." *Pittman v. Miller (In re Pittman)*, 197 B.R. 852, 854 (S.D. Ind. 1996) (citations and quotation omitted).

7.      Section 523(a) provides, in relevant part:

(a)  A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

* * *

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

* * *

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive . . .

### A. Use of a Statement in Writing

8.      The undisputed evidence shows and the Court therefore concludes that the three personal financial statements at issue—the April 26, 2012 IBB PFS, the September 19, 2012 SBA PFS, and the September 19, 2012 CFB PFS—were statements in writing used by Galyan to secure a loan from CFB.

### B. Materially False

9.     "Material falsity has been defined as 'an important or substantial untruth.'" *Matter of Bogstad*, 779 F.2d 370, 375 (7th Cir. 1985) (citations omitted).   Courts have also described a materially false statement as "one that paints a substantially inaccurate picture of a debtor's financial condition by misrepresenting information of the type which normally would affect the decision to grant credit."  *Midwest Comm. Fed. Cr. Union v. Sharp (In re Sharp)*, 357 B.R. 760, 765 (Bankr. N.D. Ohio 2007) (citation omitted).   Moreover, "[t]he omission, concealment, or understatement of liabilities will ordinarily constitute a materially false statement."  4 COLLIER ON BANKRUPTCY, ¶ 523.08, at 523–48 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).

10.     "A recurring guidepost used by courts has been to examine whether the lender would have made the loan had he known of the debtor's true financial condition."  *Bogstad*, 779 F.2d at 375 (citations omitted).  This guidepost is sometimes referred to as the "*causa sine qua non*" or "but for" test.  *Selfreliance Fed. Credit Union v. Harasymiw (In re Harasymiw)*, 895 F.2d 1170, 1172 (7th Cir. 1990).

11.     Galyan acknowledges the material falseness of his representations that he personally owned 100% of the Real Estate or that he owned 100% of Galyan Enterprises which in turn owned the Real Estate.  *See* Galyan's Brief, ¶ 1.  These false representations were made by Galyan on the three personal financial statements prepared and executed by Galyan in 2012.

12.     Galyan also does not dispute the falseness of his representation that Galyan did not owe any debt to his father, Patrick Galyan.  This false representation was made by Galyan through his omitted reference to the May 2011 Installment Promissory Note on the three personal financial statements prepared and executed by Galyan in 2012.

13.     Moreover, credible testimony of CFB representatives Ayers and Blume established that CFB would not have made the same loan to Galyan's entities had CFB known of Galyan's true financial condition with regard to either: (a) Galyan's lack of 100% ownership of the Real Estate and/or Galyan Enterprises; or (b) Galyan's debt obligation owing to his father.

14.     The Court concludes that Galyan's April 26, 2012 IBB PFS, September 19, 2012 SBA PFS, and September 19, 2012 CFB PFS each contained materially false representations.

### C. Respecting the Debtor's Financial Condition

15.     The April 26, 2012 IBB PFS, September 19, 2012 SBA PFS, and September 19, 2012 CFB PFS are clearly written documents that describe Galyan's financial condition. The information provided—Galyan's represented assets and liabilities—would be "sufficient to determine financial responsibility." *Bednarsz v. Brzakala (In re Brzakala)*, 305 B.R. 705, 709 (Bankr. N.D. Ill. 2004). Galyan has acknowledged that the second element of § 523(a)(2)(B) has been met. *See* Galyan's Brief, ¶ 1.

### D. On Which the Creditor Reasonably Relied

16.     Courts have held that "[p]artial reliance on a false representation in connection with an extension of credit has been held to be an adequate basis to prevent discharge of an underlying debt." *Household Fin. Corp. v. Howard (In re Howard)*, 73 B.R. 694, 707-08 (Bankr. N.D. Ind. 1987) (citations omitted).

17.     As set forth above, the credible testimony of CFB representatives Ayers and Blume established actual reliance by CFB on the misrepresentations contained in Galyan's April 26, 2012 IBB PFS, September 19, 2012 SBA PFS, and September 19, 2012 CFB PFS in approving and making the December 2012 loan to Galyan's entities. If CFB had known the information provided by Galyan was false with regard to either his ownership interest in the Real

Estate and/or Galyan Enterprises or the debt obligation owed by Galyan to his father, CFB would not have made the December 2012 loan to Galyan's entities. Moreover, in signing each of those personal financial statements, Galyan acknowledged that CFB was relying on the information submitted by Galyan when making its decision whether or not to approve the requested loan.

18. "The reasonableness of a creditor's reliance should be determined on a case by case basis." *Webster Bank, N.A. v. Contos (In re Contos)*, 417 B.R. 557, 566 (Bankr. N.D. Ill. 2009) (citing *In re Bonnett*, 895 F.2d 1155, 1157 (7th Cir. 1989)).

> The Seventh Circuit has recognized that, in considering the reasonableness of a creditor's reliance, the court should not "undertake a subjective evaluation and judgment of a creditor's lending policy and practices," *In re Garman*, 643 F.2d 1252, 1256 (1980), nor use the requirement to "second-guess a creditor's lending decisions." *In re Morris*, 223 F.3d 548, 553 (2000). So while "the concept of reasonable reliance does not generally require creditors to conduct an investigation prior to entering into agreements with prospective debtors," *Id.* at 554, a lender may not ignore evidence of deceit and expect the court to later grant an exception to the debtor's discharge. *In re Bogstad*, 779 F.2d 370, 372 n. 4 (1985)

*Hanselman*, 454 B.R. at 465.

19. "Two factors to consider when determining whether a creditor's reliance was reasonable are (1) whether the creditor's standard practices in evaluating credit-worthiness were followed and (2) whether there existed a 'red flag' that would have alerted an ordinarily prudent lender to the possibility that the information is inaccurate." *Id.* at 464-65 (citing *Contos*, 417 B.R. at 566).

20. Section 523(a)(2)(B) does not require the creditor "to make all possible inquiries or investigate all possible avenues of investigation[,]" and the creditor "need not necessarily independently investigate when the information on the application is not the creditor's sole source of the creditor's reliance[.]" *Howard*, 73 B.R. at 708 (citations omitted).

21.    The Court finds that in approving and making the December 2012 loan to Galyan, CFB followed its Loan Policy and standard underwriting practices in analyzing the proposed loan and credit-worthiness, including but not limited to:  analyzing all documents provided with regard to Galyan's business entities; analyzing all documents provided with regard to Galyan's financial condition; and obtaining a credit report on Galyan.  In addition, before CFB made its loan, Galyan had been through the credit underwriting process and approved no less than two times by Indiana Business Bank and the SBA, as well as having been previously vetted by Marco's Franchising.

22.    The Court also finds that no red flag existed that would have alerted CFB to the possibility that the information provided by Galyan in his personal financial statements was inaccurate.  Unlike the creditor in *Hanselman*, CFB had no reason to not believe the information contained in Galyan's personal financial statements.  With regard to Galyan's represented ownership interest, CFB made an appropriate and understandable business decision not to take the Real Estate as collateral and further to avoid the expense of undertaking an appraisal or title search.  With regard to Galyan's undisclosed debt to Patrick Galyan, CFB obtained a credit report; however, because of the nature of the debt and creditor, the May 2011 Installment Promissory Note was not reflected in the credit report.  The Court can envision no investigation CFB could have undertaken in order to discover this debt which Galyan was determined to conceal.

23.    The Court therefore concludes that CFB both actually and reasonably relied on Galyan's representations as to his financial condition.

### E. Made or Published with the Intent to Deceive

24.    "The law recognizes the duty of each to refrain from even attempted deceit of

another with whom he deals, and the right of the latter to assume that he will do so . . . ." *Northern Trust Co. v. Garman (In re Garman)*, 643 F.2d 1252, 1260 (7th Cir. 1980) (quotation omitted). Courts have noted that "actual intent is only rarely ascertainable by direct evidence as a debtor is unlikely to ever admit acting in a fraudulent manner. Consequently, like with other matters where the debtor's state of mind is placed at issue, the use of circumstantial is usually necessary to determine whether the debtor acted with the requisite intent to deceive." *Sharp*, 357 B.R. at 767 (citation omitted).

25.    For that reason, "[w]hile a creditor can prove intent to deceive through direct evidence, … it may also be inferred where 'a person knowingly or recklessly makes a false representation which the person knows or should know will induce another to make a loan.'" *Hanselman*, 454 B.R. at 465-66 (quoting *In re Sheridan*, 57 F.3d 627, 633 (7th Cir. 1995)). *See also Fin. Pacific Leasing, LLC v. Kilaru (In re Kilaru)*, 552 B.R. 806, 815 (Bankr. N.D. Ill. 2016) (quotation omitted) (explaining that a debtor's "intent to deceive may also be demonstrated by showing reckless indifference to, or reckless disregard for, the accuracy of the information in a financial statement"). In addition, a debtor's mere "unsupported assertions of honest intent will not overcome the natural inferences from admitted facts." *Howard, 73 B.R. at 700* (citing 3 COLLIER ON BANKRUPTCY, ¶ 523.09, at 523–62 (L. King, 15th ed.)).

26.    Courts have frequently found debt to be nondischargeable under similar circumstances. For instance, the court in *Cutillo v. Hubner (In re Cutillo)*, 247 B.R. 766 (S.D. Ind. 2000) upheld the bankruptcy court's determination that certain of debtor's debt was excepted from discharge by operation of § 523(a)(2)(B) and found that the written financial information debtor transmitted to creditors was false and that because debtor was intimately involved in the company's operations and had ready access to its books and accounting records,

he had to have been aware of the falseness of the information.  Similarly, in *First Nat'l Bank of Lansing v. Kreps* (*In re Kreps*), 700 F.2d 372 (7th Cir. 1983), the Seventh Circuit reversed the lower court's granting of discharge in favor of debtors noting that it was undisputed that the list of debtors' assets, which was prepared as part of the debtors seeking a second renewal of loan, contained materially false information regarding the scope of debtors' ownership interest in certain real estate.  In *Harasymiw*, 895 F.2d at 1174, the court held that the debtor's failure to mention a $128,000 mortgage on real property offered as collateral for loan made her financial statements materially false and that the debt was nondischargeable.

27.     During trial, Galyan testified that at the time he completed and executed the multiple personal financial statements in 2012, he believed he was the 100% owner of the Real Estate and/or Galyan Enterprises.  However, this claimed subjective belief by Galyan is not supported by the December 31, 2007 Assignment of Membership Interest, the February 20, 2008 Deal Structure, the March 25, 2008 letter from Harris, N.A., the March 26, 2008 Redemption Agreement, the March 26, 2008 Written Consent, the April 10, 2008 Mortgage, the August 11 and October 12, 2008 correspondence from Patrick Galyan and Wingert, or the 2011 and 2012 K-1's Galyan received from Galyan Enterprises.  To the contrary, these documents (many of which were signed by Galyan himself) clearly establish that Galyan was not the 100% owner of the Real Estate or of Galyan Enterprises.

28.     In light of Galyan's background, education, and extensive business experience, the Court does not find credible Galyan's testimony that he did not read and/or understand the implications of documents at the time Galyan executed such documents.

29.    Even if the Court were to credit Galyan's testimony, the Court finds that Galyan acted recklessly in not reading, understanding, asking for clarification, and/or seeking outside counsel regarding the significance and meaning of such documents prior to executing them.

30.    The Court credits Galyan's testimony that he took no steps to verify the scope, if any, of his ownership interest in the Real Estate or in Galyan Enterprises.  Therefore, the Court finds that even if Galyan's misrepresentations on his April 26, 2012 IBB PFS, September 19, 2012 SBA PFS, and September 19, 2012 CFB PFS regarding his ownership interest in the Real Estate and/or in Galyan Enterprises were not made knowingly (which they may in fact have been), such misrepresentations were made recklessly.  The Court further finds that Galyan knew or should have known his false representations would induce CFB to make the loan.

31.    The Court also finds that Galyan's omissions from his April 26, 2012 IBB PFS, September 19, 2012 SBA PFS, and September 19, 2012 CFB PFS of the liability owing to his father pursuant to the May 2011 Installment Promissory Note were made knowingly and deliberately.  These omitted references to Galyan's debt to Patrick Galyan were not the result of an honest mistake by Galyan; rather, Galyan acted in bad faith when he consciously and repeatedly decided to omit reference to that liability.  *See e.g.*, *Sharp*, 357 B.R. at 769 (citation omitted) (finding that in light of the debtor's financial acumen, even if she had been directed by a salesperson to list a misrepresentation, the debtor "was still, in the end, fully responsible for her statements").

32.    The Court concludes that Galyan made or published his April 26, 2012 IBB PFS, September 19, 2012 SBA PFS, and September 19, 2012 CFB PFS with the intent to deceive CFB.

**Decision**

Based on the foregoing, the Court hereby concludes that:

A.      CFB has proven by a preponderance of the evidence each and all of the elements set forth in § 523(a)(2)(B).

B.      The loan debt owed by Galyan to CFB is NONDISCHARGEABLE pursuant to § 523(a)(2)(B).

The Court will enter judgment in favor of Community First Bank of Indiana and against Courtney P. Galyan consistent with these findings of fact and conclusions of law contemporaneously herewith.

# # #